**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 24-cv-22876-ALTMAN/Lett**

PROGRESSIVE EXPRESS
INSURANCE COMPANY,

       *Plaintiff,*

v.

YVETTE RIVERA, *as personal*
*representative of the* ESTATE OF
GLADY YVETTE BORCELA, *et al.,*

       *Defendants.*

_____/

## ORDER GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT

On July 23, 2022, Natalia Harrell shot and killed Glady Yvette Borcela while the two were in the back seat of a 2020 Cadillac Escalade. *See* Complaint [ECF No. 1] ¶ 33 ("Harrell subsequently discharged her firearm at point blank range, shooting and ultimately killing decedent, Glady Yvette Borcela."). At the time of the shooting, the Escalade was being driven by Defendant Dunier de Castro Achon, who had "accepted the group's request for [a] ride through the 'Uber' ride share application" earlier that night. *Id.* ¶ 28. Before the shooting, Progressive Express Insurance Company (our Plaintiff) had issued an insurance policy (the "Period 2-3 Policy") to Defendant Raiser (FL), LLC (a wholly owned subsidiary of Defendant Uber Technologies, Inc.) that "affords liability coverage for an 'accident,' 'arising out of the ownership, maintenance or use of an insured auto during a prearranged service.'" *Id.* ¶ 45.

Progressive now moves for summary judgment on a single issue: whether it is "obligated to defend" the various Defendants when "the undisputed evidence now shows that there is no coverage under the Period 2-3 Policy because this shooting, even though it occurred inside a vehicle, does not arise 'out of the ownership, maintenance or use' of an insured auto necessary to implicate coverage."

Motion for Partial Summary Judgment ("MSJ") [ECF No. 48-1] at 7. The MSJ has been fully briefed. *See* Opposition to Progressive's Motion for Partial Summary Judgment ("Response") [ECF No. 51]; Reply Memorandum to Estate's Response ("Reply") [ECF No. 53]. After careful review, we **GRANT** the motion.

## THE FACTS[1]

Florida law requires "transportation network companies" ("TNCs") to "maintain primary automobile insurance" on behalf of TNC drivers. FLA. STAT. § 627.748(7)(a). That insurance policy must provide "liability coverage of at least $1 million for death, bodily injury, and property damage . . . while a TNC driver is engaged in a prearranged ride[.]" *Id.* § 627.748(7)(c)(1)(a). Defendant Raiser "and its affiliated entities, including [Defendant] Uber Technologies, Inc., provide services that would satisfy the TNC Statute's definition of a 'transportation network company.'" Progressive's Statement of Material Facts ("SOMF") [ECF No. 48-2] ¶ 1. On March 1, 2022, Progressive "issued the Period 2-3 Policy, Policy No. 06250110" to Raiser—which covered "situations where a ride has been accepted and the driver is either heading to pick up or has the passenger in the vehicle[.]" *Id.* ¶ 2; *see generally* Period 2-3 Policy [ECF No. 1-1] at 2–64.

The Period 2-3 Policy's "relevant liability insuring language . . . provides, in pertinent part, as follows":

---

[1] Both Progressive and Yvette Rivera—the only remaining Defendant who either hasn't been dismissed or is currently in default—agree that there are *no disputed facts*. *See* MSJ at 7 ("This Motion presents a single question[ ], one which can be resolved as a matter of law as there is no conceivable factual dispute concerning what has been alleged[.]"); Response at 3 ("Rivera agrees with Progressive that, with respect to the single issue now before the Court—*i.e.*, whether Progressive has a duty to defend the instant policy's insureds in the underlying tort case—there are no disputed issues of fact[.]"). Rivera, in fact, doesn't dispute any of the facts Progressive alleged in its Statement of Material Facts. *See* Rivera's Response to Progressive's Statement of Material Facts ("RSOMF") [ECF No. 52] at 1–3; *see also* S.D. FLA. L.R. 56.1(c) ("All material facts in any party's Statement of Material Facts may be deemed admitted unless controverted by the other party's Statement of Material Facts, provided that . . . the Court finds that the material fact at issue is supported by properly cited record evidence[.]").

Subject to the Limits of Liability, if you pay the premium for liability coverage for the *insured auto* involved, we will pay damages, other than punitive or exemplary damages, for bodily injury and property damage for which an insured becomes legally responsible *because of an accident arising out of the ownership, maintenance or use of an insured auto during a prearranged service*.

*Id.* ¶ 3 (emphasis added) (quoting Period 2-3 Policy at 43).

On July 23, 2022,[2] Defendant Achon, an Uber driver, "logged into the 'Uber' ride share application" and picked up "a group that made a request for a ride utilizing the 'Uber' ride share application." SOMF ¶¶ 8–9. This group included the decedent, Borcela, and the shooter, Harrell. *See id.* ¶ 9. While Achon was driving "the group to a location at or near 96 SE 1st Street in Miami, Florida[,]" Harrell and Borcela got into a "verbal altercation" in "the rear seat of the vehicle[.]" *Id.* ¶¶ 12, 14. As the dispute escalated, Harrell "exited the rear seat of the [vehicle] and placed herself into an unsafe and unsecured position between the driver's seat and the front passenger seat directly next to [Achon] in the front of the [vehicle]." *Id.* ¶ 29 (quoting State Court Complaint [ECF No. 1-2] ¶ 32). As Harrell extricated herself from the rear seats, "Achon continued to drive the [vehicle] and ignored the extremely volatile and dangerous condition within the [vehicle]." RSOMF ¶ 32 (quoting State Court Complaint ¶ 33); *see also* Reply Statement of Material Facts [ECF No. 53-1] at 2 ("Undisputed that the cited language is contained at paragraph 33 of the underlying [State Court Complaint]."). Harrell then "retrieved a firearm from her purse while shouting threats of violence at [Borcela], who remained in the rear seat of the [vehicle]." SOMF ¶ 29. After "extensively and repeatedly shouting threats[,]" Harrell "discharged her firearm at point blank range, shooting and ultimately killing [Borcela]." *Id.* ¶ 30 (quoting State Court Complaint ¶ 34).

Almost two years after the shooting, on May 3, 2024, Defendant Rivera "as Personal Representative of Borcela's Estate, filed a lawsuit in the Eleventh Judicial Circuit in and for Miami-

---

[2] Parts of Progressive's MSJ and SOMF erroneously list this date as "November 9, 2022." *See* MSJ at 4; SOMF ¶ 8.

Dade County, Florida, Case No. 2024-008188-CA-01, in connection with the July 23, 2022 incident." *Id.* ¶ 17; *see generally* State Court Complaint. In that state-court action, Rivera asserted 27 wrongful-death counts against four defendants: Achon, the driver; Yenelyz A. Ruiz Gomez, the owner of the vehicle; Uber, the ride-share company; and Raiser, a subsidiary of Uber. *See* SOMF ¶ 18.

Progressive filed this federal lawsuit on July 29, 2024, against Rivera, Achon, Gomez, Raiser, and Uber. *See* Complaint [ECF No. 1]. In its Complaint, Progressive asserts three counts—all for declaratory relief. Count I asserts that Progressive "has no duty to defend or indemnify [the Defendants]" because "one individual shooting another [does] not 'arise out of the ownership, maintenance or use,' of [an] insured auto[.]" *Id.* ¶¶ 47, 49. In Count II, Progressive argues that it has no duty to defend or indemnify the Defendants because "one individual shooting another[ ] is not an accident under the Period 2-3 Policy in that such an act was neither unexpected nor unintended by the insured[.]" *Id.* ¶ 60. Finally, in Count III, Progressive claims that the shooting was "an intentional act" that's "expressly excluded" by the Period 2-3 Policy. *Id.* ¶¶ 71–72.[3]

Two of the five Defendants, Achon and Gomez, never appeared in this action and are in default. *See* Clerk's Default [ECF 21]. Two other Defendants (Uber and Raiser) have been dismissed from this case because they "stipulate and agree that the [Period 2-3 Policy] does not provide liability coverage for defense or indemnity to [the Defendants] with regard to the July 23, 2022 accident." Stipulation between Progressive and Defendants Raiser and Uber [ECF No. 40] at 2. That leaves Rivera as the only Defendant who contests Progressive's claims.

---

[3] On November 1, 2024, we found that "any duty to indemnify claim raised in the Complaint" must be stayed "pending the resolution of the related state-court proceedings." Nov. 1, 2024, Order [ECF No. 32] at 1 (citing *Dream Builders of S. Fla. Corp. v. Mid-Continent Cas. Co.*, 2019 WL 3821552, at *3 (S.D. Fla. Aug. 15, 2019) (Altman, J.)). But the duty-to-defend claims, embedded in all three counts, are "still ripe." *Ibid.*

## THE LAW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at 248. A dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *Ibid.* "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

At summary judgment, the moving party bears the initial burden of "showing the absence of a genuine issue as to any material fact." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."). Once the moving party satisfies its initial burden, the burden then shifts to the non-moving party to "come forward with specific facts showing there is a genuine issue for trial." *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The Court, in ruling on a motion for summary judgment, "need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3); *see also HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 703 F. App'x 814, 817 (11th Cir. 2017) (noting that a "court may decide a motion for summary judgment without undertaking an independent search of the record"

(quoting FED. R. CIV. P. 56 advisory committee's note)). In any event, on summary judgment, the Court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party." *Pennington*, 261 F.3d at 1265.

In sum, then, if there are any genuine issues of material fact, the Court must deny summary judgment and proceed to trial. *Whelan v. Royal Caribbean Cruises Ltd.*, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (Ungaro, J.). On the other hand, the Court must grant summary judgment if a party "has failed to make a sufficient showing on an essential element of her case." *Celotex*, 477 U.S. at 323; *see also Lima v. Fla. Dep't of Child. & Fams.*, 627 F. App'x 782, 785–86 (11th Cir. 2015) ("If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." (quoting *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir. 1994))).

## ANALYSIS

Since there are no disputed facts, the only issue for us to decide is whether—under Florida law—"Harrell's act [of] shooting Borcela arises out of the 'ownership, maintenance or use' of an insured auto." MSJ at 7. Progressive asks us to apply the three-factor test the Florida Supreme Court articulated in *Race v. Nationwide Mutual Fire Insurance Co.*, 542 So. 2d 347 (Fla. 1989). *See id.* at 9. If we do that, Progressive says, we'll find that "shootings, such as that involved here, are not encompassed within the insuring language of an incident arising from the 'ownership, maintenance, or use' of an insured auto." *Id.* at 11.

Rivera counters that the Florida Supreme Court "never adopted" the *Race* test and urges us, instead, to apply the holding of *Taurus Holdings, Inc. v. U.S. Fiduciary and Guaranty Co.*, 913 So. 2d 528 (Fla. 2005). *See* Response at 7–8. That test, in Rivera's view, involves a far "more expansive interpretation of the term 'arising out of'" that "requires only some level of causation greater than coincidence." *Id.* at 9 (cleaned up). According to Rivera, under this more permissive test, Progressive

has a duty to defend because the shooting had "a connection with Mr. Achon's use of the vehicle." *Id.* at 10.

As we'll explain, Florida's state and federal courts are divided over which of these two tests to apply in circumstances like ours. But our review of the relevant cases suggests that Rivera is right: The Florida Supreme Court has "never adopted" the *Race* test—so the simpler test from *Taurus Holdings* controls our decision here. Even under that test though, Progressive has no duty to defend under the facts of our case.

## I.      The *Race* Test Doesn't Apply

"An insurer's duty to defend arises from the insurance contract and policy." *Zurich Am. Ins. Co. v. Nat'l Specialty Ins. Co.*, 246 F. Supp. 3d 1347, 1355 (S.D. Fla. 2017) (Bloom, J.). If "there is no contractual duty to defend in the parties' contract[,] then there is no duty to defend." *Allstate Ins. Co. v. RJT Enters., Inc.*, 692 So. 2d 142, 144 (Fla. 1997); *see also ibid.* ("We reiterate that, in the absence of an express statutory or contractual duty to defend, there is no such duty."). "In insurance coverage cases under Florida law, courts look at the insurance policy as a whole and give every provision its full meaning and operative effect." *State Farm Fire and Cas. Co. v. Steinberg*, 393 F.3d 1226, 1230 (11th Cir. 2004). "If that language is unambiguous, it governs." *Ibid.* If the language is ambiguous, the terms must be "construed against the insurer and in favor of coverage." *Trailer Bridge, Inc. v. Ill. Nat'l Ins. Co.*, 657 F.3d 1135, 1141 (11th Cir. 2011) (quoting *Taurus Holdings*, 913 So. 2d at 532); *see also Purrelli v. State Farm Fire & Cas. Co.*, 698 So. 2d 618, 620 (Fla. 2d DCA 1997) ("If an insurance policy is ambiguous, the ambiguity must be resolved liberally in favor of the insured."). An "insurer's duty to defend its insured against a legal action arises when the complaint alleges facts that fairly and potentially bring the suit within policy coverage. The duty to defend must be determined from the allegations in the complaint." *Hartford Accident & Indem. Co. v. Beaver*, 466 F.3d 1289, 1292 (11th Cir. 2006) (quoting *Jones v. Fla. Ins. Guar. Ass'n*, 908 So. 2d 435, 442–43 (Fla. 2005)).

This case turns on whether the shooting is "an accident arising out of the ownership, maintenance or use of an insured auto during a prearranged service." Period 2-3 Policy at 43; *see also* MSJ at 8 ("[T]he operative insuring language for the Period 2-3 Policy limits the focus of the coverage inquiry to one question—[does] the shooting arise[ ] from the ownership, maintenance or use of an insured auto[?]"); Response at 6 ("The proper legal interpretation of the phrase 'arising out of' is critical to understanding the coverage afforded by the policy."). "Florida courts have held that the critical language in the [policy] at issue—'arising out of the ownership, maintenance, or use of an automobile'—is unambiguous." *Sunshine State Ins. Co. v. Jones*, 77 So. 3d 254, 257 (Fla. 4th DCA 2012).

As we've said, Progressive relies on *Race*, a case where an "uninsured motorist[ ] intentional[ly] assaulted [Race] at the scene of a prior automobile accident." 542 So. 2d at 347.[4] The insurance company denied Race's claim, finding "that his injuries resulted from 'an intentional assault by a third person outside of the plaintiffs' motor vehicle and not as a result of the operation, maintenance or use of an uninsured motor vehicle.'" *Id.* at 348. Applying the Florida Supreme Court's reasoning in *Government Employees Insurance Co. v. Novak*, 453 So. 2d 1116 (Fla. 1984), the Third DCA found that the insurance company didn't have a duty to defend because there was "an insufficient nexus between the uninsured vehicle and the injury to allow recovery." *Ibid.* While the Florida Supreme Court agreed that "the connection between Race's injury and Thompson's vehicle was too tenuous to provide [uninsured motorist ('UM')] coverage[,]" *id.* at 351, it criticized the Third DCA's reliance on *Novak*, *see ibid.* ("In its opinion, the court below assumed that the [personal-injury protection ('PIP')] nexus

---

[4] *See also ibid.* ("Race was stopped at a red light when he was rear-ended by Robert Thompson. Race walked back to Thompson, who remained in his car, to exchange identification and insurance information. After a discussion about what to do with the cars and whether to call the police, Thompson stepped out of his car and asked Race for identification. As Race reached into his bag to remove his insurance papers and identification, Thompson, who thought Race was pulling out a gun, knocked Race to the ground. When Race tried to get up, Thompson hit him again. Race suffered permanent injuries, including broken teeth, a broken jaw, and a fractured hand.").

analysis of *Novak* was applicable to UM coverage but held that there was an insufficient nexus to permit recovery. Because we have rejected the *Novak* standard for nexus in UM cases, we need not pass on whether the court's application of the *Novak* standard to the facts of this case was correct.").

But, while discussing the Third DCA's decision, the Florida Supreme Court cited a treatise that analyzed "liability coverage for an act arising out of the ownership, maintenance, and use of a motor vehicle." *Id.* at 349. This portion of the opinion—which has come to be known as the "*Race* test*"—reads as follows:

> It has been stated that the liability of an insurer under the "ownership, maintenance, or use" provision should be measured in accord with the terms of a policy as understood by a person of reasonable intelligence. The word "coverage" as used in automobile liability policy means the sum of risks which the policy covers. Ownership, maintenance, or use of the automobile need not be the direct and efficient cause of the injury sustained.
>
> Rather, the courts have only required that some form of causal relationship exist between the insured vehicle and the accident. However, liability does not extend to results distinctly remote, though within the line of causation.
>
> Accordingly, three rather interesting rules have been set up to determine the insurer's liability: 1. The accident must have arisen out of the inherent nature of the automobile, as such; 2. The accident must have arisen within the natural territorial limits of an automobile, and the actual use, loading, or unloading must not have terminated; 3. The automobile must not merely contribute to cause the condition which produces the injury, but must, itself, produce the injury.

*Ibid.* (cleaned up) (quoting 6B J. APPLEMAN, INSURANCE LAW AND PRACTICE § 4317 (Buckley ed. 1979)); *accord Progressive Express Ins. Co. v. Raiser (FL), LLC*, 2024 WL 1529143, at *13 (S.D. Fla. Apr. 9, 2024) (Bloom, J.) ("The Court proceeds to apply the *Race* three-factor test to determine whether the Incident arises out of the ownership, maintenance, or use of a motor vehicle: the accident (1) must have arisen out of the inherent nature of the automobile, as such; (2) must have arisen within the natural territorial limits of an automobile, and the actual use, loading, or unloading must not have terminated; and (3) the automobile must not merely contribute to cause the condition which produces the injury, but must, itself, produce the injury." (cleaned up)).

Still, there's some controversy surrounding the "*Race* test." In her concurring opinion, Justice Barkett criticized the majority for failing to explicitly articulate a test for incidents that arise out of the ownership, maintenance, or use of a vehicle. *See Race*, 542 So. 2d at 351 (Barkett, J., concurring) ("Indeed, other than rejecting *Novak*, I cannot discern from the majority opinion precisely what test will control this issue in the future."). Many courts, informed by Justice Barkett's separate opinion and the majority's failure to explicitly adopt the *Race* test, have concluded that the *Race* test is mere dicta and that it has *never* been the law in Florida. *See, e.g.*, *Jones*, 77 So. 3d at 259 ("*Race* did not change the law in Florida[.]"); *Carpenter v. Sapp*, 569 So. 2d 1291, 1293 (Fla. 2d DCA 1990) ("[W]e believe that construing *Race* to include this three-prong test in the law of Florida would be misplaced."); *N.H. Ins. Co. v. Champion*, 2013 WL 12156445, at *6 (M.D. Fla. Nov. 25, 2013) (Conway, J.) ("The Florida Supreme Court never adopted the three-factor [*Race*] test, and then-Justice Barkett questioned its applicability in a concurring opinion in the same case. . . . *Race* did not actually change the law[.]"). Of course, as Progressive's briefing makes clear, *see generally* MSJ at 10–12; Reply at 4–6, many Florida state and federal courts *have* applied the *Race* test, *cf. Allstate Ins. Co. v. Safer*, 317 F. Supp. 2d 1345, 1356 (M.D. Fla. 2004) (Corrigan, J.) ("The three part inquiry cited in *Race,* which some Florida courts have subsequently deemed as the '*Race* test,' has not been uniformly applied in Florida case law.").

The alternative test, proposed by Rivera, comes from *Taurus Holdings*. Unlike *Race*, *Taurus Holdings* had nothing to do with automobile insurance and instead concerned "commercial general liability insurance policies" issued to firearms manufacturers. 913 So. 2d at 530. "The provision at issue exclude[d] coverage for 'all bodily injury and property damage occurring away from premises you own or rent and *arising out of* your product.'" *Id.* at 540 (emphasis added). The Florida Supreme Court determined that the term "arising out of" is "broader in meaning than the term 'caused by' and means 'originating from,' 'having its origin in,' 'growing out of,' 'flowing from,' 'incident to' or 'having a connection with.'" *Id.* at 539 (quoting *Hagen v. Aetna Cas. & Sur. Co.*, 675 So. 2d 963, 965 (Fla. 5th

DCA 1996)). Although the court referenced *Race* approvingly, it didn't mention the so-called "*Race* test" and instead held that "*Race* stands for the proposition that 'arising out of' does not equate to proximate cause—at least in coverage provisions—it does require some level of causation greater than coincidence." *Id.* at 533; *see also id.* at 539–40 ("As we implied in *Race,* this requires more than a mere coincidence between the conduct (or, in this case, the product) and the injury. It requires some causal connection, or relationship. But it does not require proximate cause." (cleaned up)). The Eleventh Circuit, for its part, has described the "arising out of" standard from *Taurus Holdings* as "not difficult to meet." *Zucker v. U.S. Specialty Ins. Co.*, 856 F.3d 1343, 1349 (11th Cir. 2017).

We agree with Rivera that the *Race* test doesn't apply here because it was never adopted by the Florida Supreme Court. Indeed, a close reading of *Race* confirms that the Florida Supreme Court endorsed the same test it would articulate almost twenty years later in *Taurus Holdings.* The holding in *Race*, recall, was that the Third DCA correctly found that "the connection between Race's injury and Thompson's motor vehicle was too tenuous to provide UM coverage"—even though the lower court incorrectly applied the "*Novak* standard" to reach the right result. *Race*, 542 So. 2d at 351. And, while the Florida Supreme Court did cite the Applemen treatise's three-part test, it concluded that the Second DCA's decision in *Watson v. Watson*, 326 So. 2d 48 (Fla. 2d DCA 1976), "squarely addressed this issue," *id.* at 349–50; *see also Safter*, 317 F. Supp. 2d at 1357 ("*Race* cited *Watson* with approval and did not overrule the majority standard set forth in earlier case law. The *Race* court also did not explicitly apply the three part inquiry from Applemen to the facts of the case before it.").

The *Watson* test is *identical* to the test the Florida Supreme Court endorsed in *Taurus Holding. Compare Race*, 542 So. 2d at 350 ("[I]n order for liability coverage to exist, the incident must arise out of the ownership, maintenance or use of the car. The term 'arising out of' has been interpreted to mean originating from, growing out of, or flowing from. This does not require a showing of proximate cause between the accident and the use of the car, but there must be a causal connection or relation

11

between the two for liability to exist." (cleaned up) (quoting *Watson*, 326 So. 2d at 49)), *with Taurus Holdings*, 913 So. 2d at 539 ("The term 'arising out of' is broader in meaning than the term 'caused by' and means 'originating from,' 'having its origin in,' 'growing out of,' 'flowing from,' 'incident to' or 'having a connection with.' . . . [T]his requires more than a mere coincidence between the conduct (or, in this case, the product) and the injury. It requires some causal connection, or relationship." (cleaned up)).

Indeed, the court in *Taurus Holdings* interpreted *Race* as advancing this same causation-based test—not the three-part "*Race* test." *See* 913 So. 2d at 533 ("While *Race* stands for the proposition that 'arising out of' does not equate to proximate cause—at least in coverage provisions—it does require some level of causation greater than coincidence."); *see also Zucker*, 856 F.3d at 1349 ("The Supreme Court of Florida has concluded that the phrase 'arising out of' is not ambiguous and has a broad meaning, even when used in a policy exclusion. . . . [T]hat standard requires more than a mere coincidence between the conduct and the injury, it does not require proximate causation."); *Jones*, 77 So. 3d at 258–59 ("[T]he language 'arising out of' . . . mean[s] originating from, having its origin in, growing out of or flowing from, or in short, incident to or having connection with the use of the car. . . . *Race* did not change the law in Florida; rather, it confirmed the standard already applied by the district courts in applying the phrase arising out of the ownership, maintenance, or use of an auto." (cleaned up)).[5]

---

[5]     Some courts in Florida continue to apply the *Race* test in situations where "an accident arises out of the ownership, maintenance or use of an automobile." *Bryant v. Windhaven Ins. Co.*, 173 So. 3d 1058, 1060 (Fla. 3d DCA 2015); *see also, e.g., Raiser (FL),* 2024 WL 1529143, at *13 ("The Court proceeds to apply the *Race* three-factor test to determine whether the Incident arises out of the ownership, maintenance, or use of a motor vehicle[.]"); *Infinity Standard Ins. Co. v. Privett*, 2012 WL 12884405, at *2 (M.D. Fla. Oct. 29, 2012) (Whittemore, J.) ("Applying [the *Race*] test, Infinity's policy does not afford coverage for the shooting."). Progressive says that we would be unwise to "accept [Rivera's] misguided invitation" to "ignore" these decisions and suggests that we're bound by post-*Taurus* "Florida [a]ppellate decisions . . . [that] have continued to apply *Race*[.]" Reply at 6.

For these reasons, we find that the three-part *Race* test isn't Florida law and that an act will "arise out of" of the ownership, maintenance, or use of an automobile if it "flow[s] from or originat[es] from the use of the auto." *Safer*, 317 F. Supp. 2d at 1357; *see also Martinez v. Citizens Prop. Ins. Corp.*, 982 So. 2d 57, 58 (Fla. 3d DCA 2008) ("The Florida Supreme Court has reviewed exclusionary provisions containing the phrase 'arising out of' and has 'concluded that the phrase requires only some level of causation greater than coincidence.'" (cleaned up) (quoting *Garcia v. Fed. Ins. Co.*, 969 So. 2d 288, 293 (Fla. 2007))).

## II.     There's No Duty to Defend Under Either Test

Whether *Race* or *Taurus Holdings* governs is still secondary to the principal question: Did the shooting "aris[e] out of the ownership, maintenance or use of an insured auto during a prearranged service[?]" Period 2-3 Policy at 43. If the answer is "no," then we must grant Progressive's MSJ and find that it has no duty to defend the insured. To resolve this question, we look to the allegations in the State Court Complaint "against the insured" and determine whether the alleged act falls within the scope of the relevant policy provision. *See Steinberg*, 393 F.3d at 1230 ("Under Florida law, the general

---

We disagree. Although we "generally defer" to "the decisions of the DCAs," we don't have to do so if there's "an interdistrict conflict" or if there's "persuasive indication that the Florida Supreme Court would decide the issue otherwise[.]" *CCER Invs. LLC v. Scottsdale Ins. Co.*, 2025 WL 1311229, at *8 (S.D. Fla. May 6, 2025) (Altman, J.); *see also Peoples Gas Sys. v. Posen Constr., Inc.*, 931 F.3d 1337, 1339 (11th Cir. 2019) ("When we lack guidance from the Florida Supreme Court, we must adhere to the decisions of Florida's intermediate appellate courts absent some persuasive indication that the state's highest court would decide the issue otherwise." (cleaned up)). Here, we have both: Other DCAs have rejected the *Race* test, *see, e.g., Jones*, 77 So. 3d at 259 ("*Race* did not change the law in Florida[.]"); *Carpenter*, 569 So. 2d at 1293 ("[W]e believe that construing *Race* to include this three-prong test in the law of Florida would be misplaced."); and the Florida Supreme Court in *Taurus Holdings* (at a minimum) indicated that it never adopted the *Race* test, *see* 913 So. 2d at 533 ("While *Race* stands for the proposition that 'arising out of' does not equate to proximate cause—at least in coverage provisions— it does require some level of causation greater than coincidence."). We also aren't obliged to follow federal district-court decisions whose reasoning we disagree with. *See Georgia v. President of the United States*, 46 F.4th 1283, 1304 (11th Cir. 2022) ("[A] district court's decisions do not bind other district courts[.]"). As we've discussed, plenty of other district judges in Florida have refused to apply the *Race* test—and, after reviewing the relevant case law, we think they got it right.

rule is that an insurance company's duty to defend an insured is determined solely from the allegations in the complaint against the insured, not by the true facts of the cause of action against the insured, the insured's version of the facts or the insured's defenses. If the allegations in the complaint state facts that bring the injury within the policy's coverage, the insurer must defend regardless of the merits of the lawsuit.").[6] After reviewing these allegations, we find that the shooting *didn't* arise out of the ownership, maintenance, or use of an automobile under either the *Race* test or the *Taurus Holdings* "causal connection" test.

Progressive has no duty to defend under the *Race* test. To recap, an act won't "arise[ ] out of the ownership, maintenance, or use of a motor vehicle" under this test unless: (1) the act arose from the "inherent nature of the automobile"; (2) it occurred "within the natural territorial limits of an automobile"; and (3) "the automobile . . . produce[d] the injury." *Raiser (FL)*, 2024 WL 1529143, at *13 (quoting *Race*, 542 So. 2d at 349). Harrell's decision to shoot and kill Borcela in the back seat of an Uber doesn't satisfy either the first or the third prong of the *Race* test.[7]

For starters, shooting someone with a firearm doesn't arise from the inherent nature of a vehicle—even if "the dispute leading to the shooting arose inside a vehicle[.]" MSJ at 14. A person can be shot in any location, and there's nothing about firearms that relate in any way to the ownership,

---

[6] Those relevant portions of the State Court Complaint are repeated in the SOMF and have been laid out in the "Facts" section of this Order. *See ante*, at 3–4.

[7] For what it's worth, Rivera doesn't dispute any of this since her main argument is that the *Race* test doesn't apply. *See* Response at 7 ("It has been repeatedly recognized that the '*Race* test' is a misnomer, as the Supreme Court of Florida never adopted it, nor even applied it to the facts of *Race*."). To the extent Rivera could've said that Progressive had a duty to defend under the *Race* test, she's waived that argument. *See United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court *sua sponte* [only] in extraordinary circumstances."); *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority."); *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented . . . are deemed waived.").

maintenance, or use of an automobile. Unsurprisingly, courts applying the *Race* test to circumstances like ours have unanimously reached this common-sense conclusion. *See, e.g., Raiser (FL)*, 2024 WL 1529143, at *14 ("Bernadel's automobile was also simply a mode of transportation. Nothing about its inherent nature caused the Incident. Instead, an argument between Bernadel and McGlashan caused an altercation that culminated in Bernadel shooting Decedent. . . . Contrary to Bernadel's unsupported assertions, while the argument leading to Decedent's death began in the car, such fact does not establish the Incident concerned the inherent nature of an automobile."); *Privett*, 2012 WL 12884405, at *2 ("The incident had nothing to do with the inherent nature of the truck, as the truck was simply a mode of transportation to the site of the shooting."); *Taylor v. Phoenix Ins. Co.*, 622 So. 2d 506, 509 (Fla. 5th DCA 1993) ("A bullet wound does not arise out of the use of a motor vehicle. Shooting a gun is an act unrelated to use of a motor vehicle; it in no way depends on or involves a motor vehicle. The fact that the location of the shooter is a motor vehicle does not mean the shooting arises out of the use of the vehicle." (cleaned up)); *Fowler v. State Farm Mut. Auto. Ins. Co.*, 548 So. 2d 830, 833 (Fla. 1st DCA 1989) ("The present case is like *Race* in that the use of the automobile initially produced an atmosphere of hostility leading to a personal confrontation which escalated and resulted in injury. While Ortagus remained in his vehicle, whereas the participants in *Race* both exited their vehicles, such physical situs does not distinguish the cases or satisfy the causation standard for liability benefits as applied in *Race* to an uninsured motorist claim.").

Similarly, a shooting can't satisfy the third prong of the *Race* test because Harrell's gun—not an automobile—injured and killed Borcela. *See* SOMF ¶ 30 ("Natalia Harrell discharged her firearm at point blank range, shooting and ultimately killing the decedent, Glady Yvette Borcela."). This undisputed fact ends the analysis. *See Privett*, 2012 WL 12884405, at *2 ("On similar facts, Florida courts have consistently held that automobile policies do not afford coverage for shooting incidents, as the victim's injuries lack a sufficient causal relationship with the ownership, maintenance, or use of

the insured vehicle."); *Niglio v. Omaha Prop. and Cas. Ins. Co.*, 679 So. 2d 323, 325 (Fla. 4th DCA 1996) ("It is the third rule from the Appleman citation which precludes a finding of UM coverage in this case. At most, the Mustang only contributed to the condition producing the injury. The car merely transported and contained the shooters. The gun, and not the car, produced the injury. This was not a case where the vehicle was the instrumentality causing the injury.").

So, if Progressive were right that the *Race* test is good law in Florida, then we would agree that "[t]he shooting does not arise from the ownership, maintenance or use of an auto," and that "there is no coverage under the Period 2-3 Policy[.]" MSJ at 17; *see also Lancer Ins. Co. v. Gomez*, 799 So. 2d 334, 337 (Fla. 3d DCA 2001) ("Applying [the *Race* test] to the facts of this case, it is clear that Lancer was not liable. The first prong is not satisfied because there was no automobile accident. The shootings were intentional and did not arise out of the inherent nature of the jitney bus. . . . Finally, prong three is not applicable because the plaintiffs' injuries were caused by a gun and not by the jitney bus.").

But (as we've already held), we agree with Rivera that the Florida Supreme Court never adopted the three-part *Race* test and that the test articulated in *Taurus Holdings* has *always* been the law in Florida. Even under this less-stringent standard, though, an act still doesn't arise out of the ownership, maintenance, or use of an automobile unless there's "some causal connection, or relationship" between the automobile and the injury. *Taurus Holdings*, 913 So. 2d at 539 (quoting *Heritage Mut. Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 657 So. 2d 925, 927 (Fla. 1st DCA 1995)); *see also Champion*, 2013 WL 12156445, at *6 ("Perhaps most importantly, the Florida Supreme Court held after *Race* that the phrase 'arising out of' in insurance contracts is unambiguous and should be interpreted broadly to mean originating from, having its origin in, growing out of, flowing from, incident to, or having a connection with." (cleaned up)). Although this standard "does not require proximate cause[,]" it still requires "more than a mere coincidence between the conduct . . . and the injury." *Taurus Holdings*, 913 So. 2d at 539–40; *see also Zucker*, 856 F.3d at 1349 ("[The *Taurus Holdings*] standard requires more

16

than a mere coincidence between the conduct and the injury, it does not require proximate causation.").

While we agree with Rivera that this standard "is not difficult to meet[,]" *Zucker*, 856 F.3d at 1350, she *still* can't show that there's "some causal connection" between Borcela's senseless death and the ownership, maintenance, or use of the vehicle where she was shot. Even when we put the cases applying *Race* to one side, we can't find a single court holding that a shooting in a vehicle has a sufficient connection to the use of that vehicle under Florida law. *See, e.g.*, *Allstate Ins. Co. v. Furo*, 588 So. 2d 61, 62 (Fla. 5th DCA 1991) ("[The assailant] shot at [his ex-girlfriend] and hit Furo, not because they were in the vehicle, but because they were in the vicinity. The vehicle was merely the *situs* of the injury and not the cause of it."); *N. Ins. Co. of N.Y. v. Hampton*, 510 So. 2d 649, 651 (Fla. 5th DCA 1987) ("Bodily injuries resulting from an intentional gunshot are not caused by an accident arising out of the ownership, maintenance or use of a motor vehicle, whether the shooter or the victim was occupying a motor vehicle before or at the time of the shooting, and notwithstanding that the shooting may have resulted from ill will that arose out of some incident involving the use of the motor vehicle."); *Fla. Farm Bureau Ins. Co. v. Shaffer*, 391 So. 2d 216, 218 (Fla. 4th DCA 1980) ("The fact that the tortfeasor was occupying the car at the time of the shooting was no more than incidental and did not make the injury one resulting from the use of the vehicle."); *see also Gomez*, 799 So. 2d at 338 (citing cases for proposition that "[n]either liability nor uninsured motorist coverage cover injuries or death that are caused by criminal shootings, beatings and like, even though the shootings and beatings happened to have occurred in the vicinity of a motor vehicle").

The State Court Complaint is clear that the shooting occurred because Harrell and Borcela got into a "verbal altercation" in Achon's car and that Harrell "retrieved a firearm from her purse while shouting threats of violence" at Borcela. SOMF ¶¶ 28–29 (citing State Court Complaint ¶¶ 31–32). Had this argument began mere minutes earlier (or later), Harrell could have shot and killed Borcela

without being in Achon's vehicle. It was, in short, a mere "coincidence" that Harrell and Borcela happened to be in a car when they got into their fatal argument. *See Taurus Holdings*, 913 So. 2d at 539.

Rivera advances two counterarguments—both unpersuasive. *First*, she relies on three cases— *New Hampshire Insurance Co. v. Champion*, 2013 WL 12156445 (M.D. Fla. Nov. 25, 2013), *Heritage Mutual Insurance Co. v. State Farm Mutual Auto Insurance Co.*, 657 So. 2d 925 (Fla. 1st DCA 1995), and *Nationwide Insurance Co. of America v. Southland Lawn Care, Inc.*, 574 F. Supp. 3d 1158 (M.D. Fla. 2021) (Mendoza, J.), *aff'd*, 2023 WL 2519368 (11th Cir. Mar. 15, 2023)—to suggest that "Mr. Achon's use of the vehicle is what placed Ms. Borcela in danger." Response at 10–12. All three cases are easily distinguishable.

In *Champion*, for instance, the defendant "was brutally assaulted [and killed] aboard Bus C" after other members of Florida A&M University's marching band (known as the "Bus C Gang") engaged in "ritual hazing" on that bus. 2013 WL 12156445, at *8; *see also id.* at *7 ("Champion was killed by members of the Bus C Gang during initiation rituals known as 'Crossing Bus C' and 'Hot Seat,' both of which are administered only on Bus C. The Bus C Gang allegedly relegates its initiations exclusively to the third bus in the FAMU Band convoy on any given trip, otherwise known as Bus C. Hazing on ARL buses was an ongoing problem: the State T.A.C. alleges that 'Hot Seat' beatings took place with the knowledge of ARL drivers, and 'Crossing Bus C' rituals occurred with the knowledge, assistance, and direct participation of ARL drivers." (cleaned up)). But our case, unlike *Champion*, "involve[d] [a] one-off injur[y] in which the victim happened to be in (or near) a covered auto when the incident occurred." *Id.* at *8. There's thus no comparison between our case and *Champion*—where the defendant was killed as part of an intricate (and long-running) hazing ritual that was *specifically connected* with "Bus C."

*Heritage* is unpersuasive for similar reasons. In that case, a child in the back of a van "was seriously injured when another child somehow hit him in the head." *Heritage*, 657 So. 2d at 926. The First DCA found that there was "a causal connection" between the use of the van and the child's

injuries because the van's "purpose was to transport church members, including children, to and from various events[.]" *Id.* at 927. The court concluded that it was "quite foreseeable that the use of the van for such a purpose would set in motion a chain of events ending in an incident such as that which caused [the child's] injuries" because children are likely to "become rambunctious when confined in a vehicle[.]" *Ibid.* While we think this reasoning is a little silly, there's still a world of difference between transporting "rambunctious" children in a church van and driving a group of passengers who requested a ride share via Uber. *Cf. Jones*, 77 So. 3d at 258 ("Unlike the church-owned van used to transport church members, including children, to and from group activities in [*Heritage*], the Moore car was a compact four-door sedan—a private passenger car. In [*Heritage*], children's horseplay was likely to occur; in this case, it was not."). We don't think it's reasonable for an Uber driver to expect his ride-share passengers to discharge firearms in the back of his vehicle. It simply wasn't foreseeable—to Borcela, Achon, or anyone else—that getting into a ride-share vehicle with Harrell "would set in motion a chain of events ending in an incident such as that which" killed Borcela. *Heritage*, 657 So. 2d at 927.

*Southland Lawn Care* is the most inapposite of the three. There, the insured "had exited the truck and was attempting to reattach the trailer when the trailer was struck by another vehicle, causing the trailer to strike and kill [the insured]." *Southland Lawn Care*, 574 F. Supp. 3d at 1165. This injury *obviously* arose from the use of the trailer, since the insured "was attempting to reattach the trailer to the truck, which is certainly utilization of a trailer in the manner intended, i.e., attaching it to a vehicle to be towed." *Ibid.* Borcela was killed by Harrell's firearm, and (it goes without saying) shooting a firearm inside a vehicle is not a "utilization of [an automobile] in the manner intended[.]" *Ibid.*

*Second*, Rivera insists that Borcela's death was connected to Achon's use of a vehicle because she was "trapped" in the automobile when Harrell shot and killed her. *See* Response at 10–11 ("Mr. Achon's continued use of the vehicle while ignoring the extremely dangerous and volatile situation

caused [Borcela] to be trapped inside the confines of the vehicle with the person who was trying to kill her." (citing State Court Complaint ¶ 33)). This is Rivera's best argument—but it still falls short.

"[F]or an injury to arise from the use of an auto, the injury must originate or flow from the use of the vehicle." *Safer*, 317 F. Supp. 2d at 1356. As the Second DCA explained in *Carpenter*, "[w]hen . . . the use of a vehicle sets into motion a chain of events, the issue is whether that chain, uninterrupted, results in the injury complained of in such a manner that it could be contemplated that the injury could result from the initial incident." 569 So. 2d at 1293; *see also Heritage*, 657 So. 2d at 927 ("It is not sufficient that the vehicle was merely the situs of the injuries. . . . [T]he question is one of foreseeability."). Under Rivera's theory, Progressive has a duty to defend because Achon's failure to stop his vehicle and prevent Harrell—an unhinged woman who was about to brandish a firearm at her co-passenger—"trapped" Borcela in the car and caused her demise. *See* Response at 11 ("[T]he vehicle at issue here is alleged to have been operated by Mr. Achon while a 'volatile and dangerous' situation unfolded, which he ignored and continued driving, causing Ms. Borcela to become trapped, and ultimately killed.").

We disagree. There's no indication that Achon knew Harrell was armed—much less that he could have predicted she would fire the gun he didn't know she had at the other passenger in the car. Even if Achon could have (or should have) stopped his vehicle when Harrell "exited the rear seat" of his car, State Court Complaint ¶¶ 32, we can't say that Harrell's subsequent acts (retrieving her firearm and shooting Borcela) "originated," "gr[ew]," or "flowed" from Achon's decision not to stop his vehicle, *see Taurus Holdings*, 913 So. 2d at 539. To hold otherwise would create an exception that would swallow the Florida rule, which is that "[i]t is not sufficient that [a] vehicle was merely the situs of the injuries." *Heritage*, 657 So. 2d at 927.

No reasonable jury, in sum, would find that Achon's failure to stop the vehicle "set[ ] into motion a chain of events" that led to Borcela's death. *Carpenter*, 569 So. 2d at 1293; *see also Bergman v.*

*State Farm Mut. Auto. Ins. Co.*, 2011 WL 13295392, at *3 (M.D. Fla. July 29, 2011) (Adams, J.) ("Here, Plaintiff argues the injury flowed from the use of her vehicle because Mr. Davenport hit her to silence her complaints about his unsafe driving. Thus, she asserts that her injuries were 'within the realm of contemplated injuries.' . . . Plaintiff's injuries were not a foreseeable consequence of her actions. As noted by Defendant, generally there is no causal relationship between the ownership, maintenance and use of [a] motor vehicle and injuries sustained when an occupant intentionally strikes another occupant.").

The circumstances of Borcela's death are tragic—but they were also sudden and unpredictable. Based on the facts of this case—and the many similar Florida cases—we find that Borcela's death *didn't* arise from the ownership, maintenance, or use of an automobile because there was no "causal connection, or relationship" between her injuries, Harrell's firearm, and Achon's vehicle beyond "mere coincidence." *Taurus Holdings*, 913 So. 2d at 539. Since "[t]he shooting does not arise from the ownership, maintenance or use of an auto[,]" Progressive is "entitled to a declaration confirming" that "there is no coverage under the Period 2-3 Policy[.]" MSJ at 17.

*   *   *

One last thing: Our decision to grant Progressive's MSJ won't dispose of this case because neither party moved for summary judgment on Counts II or III of the Complaint. *See generally* Docket. This Order thus *isn't* a "final decision" and *isn't* directly appealable to the Eleventh Circuit. *See Jenkins v. Prime Ins. Co.*, 32 F.4th 1343, 1345 (11th Cir. 2022) ("A final decision is one that ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." (cleaned up)). We can, however, "direct entry of a final judgment as to one or more, but fewer than all, claims or parties . . . if the court expressly determines that there is no just reason for delay." FED. R. CIV. P. 54(b). Rule 54(b) certification is appropriate when an "immediate appeal would alleviate some danger of hardship or justice associated with delay." *Ebrahimi v. City of Huntsville Bd. of Educ.*, 114 F.3d 162, 166 (11th Cir.

1997). "When deciding whether there is 'no just reason for delay,' the district court must balance judicial administrative interests and relevant equitable concerns, considering the historic federal policy against piecemeal appeals along with hardship or injustice associated with delay." *Chapman v. Dunn*, 129 F.4th 1307, 1313 (11th Cir. 2025) (cleaned up). While we think Rule 54(b) certification might be appropriate here, we'll hold off on making any final decision until we've heard from the parties on this issue. To that end, we'll schedule a brief status conference on the Rule 54(b) issue for **Friday, September 19, 2025, at 2:30 PM**.

CONCLUSION

Accordingly, we hereby **ORDER** and **ADJUDGE** that Progressive's Motion for Summary Judgment [ECF No. 48] is **GRANTED**. A status conference is **SET** for **Friday, September 19, 2025, at 2:30 PM**.

**DONE AND ORDERED** in the Southern District of Florida on September 16, 2025.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record